281 P.3d 1028

**FL RECEIVABLES TRUST 2002–A, a Delaware statutory trust, Plaintiff/Counterdefendant/Appellee,**

**v.**

**ARIZONA MILLS, L.L.C., a Delaware limited liability company, Defendant/Counterclaimant/Appellant.**

**FL Receivables Trust 2002–A, a Delaware statutory trust, Plaintiff/Counterdefendant/Appellant,**

**v.**

**Arizona Mills, L.L.C., a Delaware limited liability company, Defendant/Counterclaimant/Appellee.**

No. 1 CA–CV 10–0803.

Court of Appeals of Arizona, Division 1.

June 21, 2012.

Caldwell, Padish & Wells, PLLC by James E. Padish and Kellie N. Wells, Scottsdale, SNR Denton US, LLP by Joshua S. Akbar and Patrick E. Fitzmaurice, New York, NY, Attorneys for FL Receivables Trust 2002–A.

Fennemore Craig, PC by Andrew M. Federhar, and Theresa Dwyer–Federhar, and Jason D. Specht, Phoenix, Attorneys for Arizona Mills, LLC.

## OPINION

THOMPSON, Judge.

¶ 1 FL Receivables Trust 2002–A (the Trust) and Arizona Mills, L.L.C. (Mills) have competing interests in the same building and fixtures located on land owned by Mills. After this court declared the Trust's security interest superior to any interest held by Mills, the superior court held a bench trial on the Trust's claims for supplemental relief and for breach of the implied covenant of good faith and fair dealing. The court found in favor of Mills; the Trust has appealed from that ruling. Mills appeals from various other rulings entered by the court. For the following reasons, we remand to the superior court for further proceedings involving the disposition of the collateral, but otherwise affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 Mills is the owner and landlord of the Arizona Mills Mall, in Tempe, Arizona. On November 5, 1998, Mills entered into a fifteen-year ground lease with CTM Restaurants, LLC, for Lot 4, a then-undeveloped outlying mall pad. Pursuant to the lease, CTM constructed a building (the Building) on Lot 4 for operation as a Bennigan's restaurant. In March 2000, CTM and Mills entered into an amendment to the lease to allow CTM to obtain additional financing. Under the amendment, Mills agreed to subordinate to the lender its lien rights to the improvements under the lease; the amendment expressly stated that Mills did not subordinate its right with respect to the land underlying the improvements. CTM assigned its interest under the lease and the amendment to ESAD, LLC, which entered into financing agreements with Captec Financial Group, Inc., by which Captec obtained a first priority security interest in the buildings, structures, and all improvements on the property.

¶ 3 As part of the financing, Captec and Mills entered into a landlord's consent and waiver (the Consent), by which Mills agreed to subordinate "each and every right" it had with respect to the improvements and equipment. Mills did not subordinate its interest in the underlying land. Under the Consent, Mills agreed that the lender could enter the premises "for the purpose of repossessing, removing or otherwise dealing with" the equipment and leasehold improvements upon prior written notice and for no longer than thirty days, during which time the lender was required to pay rent and other charges. The Consent further provided that upon a default, the lender had "the right, but not the obligation, to cure the default within the cure periods" of the lease. The lender could also take possession under the lease and assign the tenant's interest to a third party. The Consent also permitted the lender to enter into a new lease with Mills upon payment of all fees and charges due by the tenant within thirty days after termination of the lease for an incurable default.

¶ 4 ESAD defaulted on its obligations to Captec in July 2002, and on its obligations to Mills in April 2003. On April 16, 2003, Mills notified ESAD and Captec of the default, and after the thirty-day cure period under the lease had expired, Mills declared the lease terminated. Mills locked ESAD out on May 5, 2003. Mills notified Captec of the lockout and the commencement of the lender's cure period under the Consent. Mills later learned that Captec had assigned its interest to the Trust.

¶ 5 Representatives of Mills and the Trust engaged in four telephone conversations, during the last of which the Trust requested access to the Building and the property to market them to find a replacement tenant as soon as possible. Mills declined the request because the Trust had not cured ESAD's default under the lease. The Trust was given access to the property on three occasions to deal with the collateral, but not for marketing purposes.

¶ 6 On June 6, 2003, Mills sent notice of the termination of the lease to ESAD, Captec, and the Trust. The Trust did not arrange for payment of the outstanding rent to Mills or enter into a new lease with Mills within the thirty days after Mills terminated the lease.

¶ 7 During the summer of 2003, the Trust negotiated with at least four prospective replacement tenants. Two were out-of-state Bennigan's franchisees and the other two—Ray O'Sullivan and Tim Coscarelli—proposed operating different restaurants in the Building. O'Sullivan expressed an interest in leasing the property, but asked that the loans be reduced. Coscarelli was interested only if the notes were forgiven and the rent lowered. No deal was reached with any prospective tenant.

¶ 8 A dispute arose between Mills and the Trust as to their respective rights in the Building and the other improvements. The Trust asserted it had a security interest senior to Mills's interest; Mills argued that any interest held by the Trust terminated or was waived by the Trust's refusal to cure ESAD's default and refusal to enter into a new lease under the Consent.

¶ 9 On September 19, 2003, the Trust filed suit against Mills. In its amended complaint, the Trust sought a declaration that Mills had subordinated its rights to the Trust and that the Trust's rights had not expired. The amended complaint also asserted a claim for breach of the duty of good faith and fair dealing. The Trust claimed that Mills consistently refused to cooperate to obtain a new tenant and directly interfered with the Trust's business relationship with potential tenant Ray O'Sullivan.

¶ 10 Mills answered and asserted counterclaims. Among the counterclaims were claims for breach of contract, breach of the duty of good faith and fair dealing, trespass, and unjust enrichment. Mills asserted that the Trust breached the Consent by continuing to make claims to the improvements despite having failed to make any required payments or exercise any of its rights under the Consent. Mills claimed the Trust breached the duty of good faith and fair dealing by asserting unjustified rights under the Consent, including that the Trust had no obligation to comply with the terms of the Consent, the ground lease or the amendment

to the lease, that the Trust could continue to assert rights in the equipment with no obligation to remove the equipment or make payments to Mills, and that the Trust could continue to claim ownership of or control over the Building and "cast a cloud upon Arizona Mills' title to the land without payments of any kind." Mills also asserted claims for trespass, based on the Trust's failure to remove the equipment from the property, and unjust enrichment, on the theory that, by refusing to remove the equipment making up the collateral, the Trust was benefitting by storing its collateral at Mills's expense.

¶ 11 At the request of the parties, on October 30, 2003, the court held an evidentiary hearing on the Trust's claims for declaratory relief. The court ruled in favor of Mills, finding that Mills acquired fee simple title to the improvements upon termination of the ground lease and that the Trust's interests in the premises had terminated. The Trust appealed, and this court reversed the superior court decision and remanded the matter for further proceedings. *FL Receivables Trust 2002–A v. Arizona Mills, L.L.C.*, 1 CA–CV 04–0229, slip op. at *12, ¶ 23 (Ariz. App. May 12, 2005, as amended Aug. 26, 2005) (mem. decision). This court held that, under the Uniform Commercial Code (U.C.C.), the Trust's security interest was superior to any ownership interest held by Mills because Mills had consented to the subordination and because the debtor had had the right to remove the property. *See* Ariz. Rev. Stat. (A.R.S.) § 47–9334(F) (2005). This court further noted that, where the debtor's right to remove the property terminates, the security interest continues "for a reasonable time."

¶ 12 On remand, the Trust moved for entry of judgment on its claims for declaratory judgment relief based on our decision, and moved for partial summary judgment on Mills's counterclaims. The Trust argued that Mills's counterclaims were based on an asserted right in furniture, fixtures, and equipment in the Building and that our decision that the Trust's interests were superior required dismissal of the counterclaims.

¶ 13 Mills argued that the Trust's superior security interest in the Building and the fixtures and equipment did not apply to the underlying Lot 4, and asserted that the court had yet to determine who must bear the cost of the Trust's occupation of the land. Mills argued that nothing in the Consent suggested that the Trust had the right to occupy Lot 4 for longer than the thirty days to remove the equipment unless it assumed the lease. Mills further argued that the Trust's only right in the fixtures was to remove them from Lot 4 in a reasonable and workmanlike manner, asserting that the Trust improperly tried to expand its rights by arguing that the revised U.C.C. applied, which provided remedies in addition to the removal of the collateral; Mills argued that the revised version was not applicable as the contracts at issue were executed before the effective date of the statute—July 2001. Mills filed a cross-motion for partial summary judgment seeking a declaration that the revised version of the U.C.C. did not apply to the Consent.

¶ 14 In a July 31, 2006, minute entry decision, the court declared that the Trust had a first priority security interest in the Building and the furniture, fixtures, and equipment superior to any interests of Mills, and entered judgment accordingly in favor of the Trust on its claim for a declaratory judgment. The court also granted the Trust's motion for partial summary judgment on Mills's counterclaims "based on the Court of Appeals having found [the Trust's] security interests in the building and improvements superior to any interests of Arizona Mills." The court denied Mills's motion for partial summary judgment regarding the applicable version of the U.C.C. The court noted that the prior version of the U.C.C. provided the remedy to a creditor of removal of collateral goods whereas the revised U.C.C. permitted a creditor to "sell, license, lease or otherwise dispose of the collateral." The court found that A.R.S. § 47–9702 (2005), the Savings Clause, expressly made the revised U.C.C. retroactive. The court further found that retroactive application was not unconstitutional because the remedy did not vest until after the default, which occurred after the effective date of the statute. The court con-

cluded that the Trust was entitled to employ the remedies of the revised U.C.C.[1]

¶ 15 On August 23, 2006, the court ordered the parties to immediately market the property. In September 2007, Mills presented two letters of intent from prospective tenants. A potential Bennigan's franchisee offered an initial lease rate of $140,000 per year and offered to purchase the fixtures and equipment for $25,000; a local prospective tenant offered an initial lease rate of $185,000 per year but did not offer to purchase the fixtures and equipment. The Trust rejected both offers. At the time of ESAD's default, its combined annual lease and loan payments totaled $411,307.84.

¶ 16 In March 2008, the court denied the Trust's motion for summary judgment on damages. The Trust had sought judgment on damages related to its declaratory judgment claim, seeking a determination that Mills interfered with its use of the collateral and that the interference caused damages in the amount of $709,018.63, based on the rental income that the property could have generated. The Trust argued that, under the U.C.C., its security interest attached to the collateral and any identifiable proceeds of the collateral, and that the term "proceeds" included "claims arising out of the loss, nonconformity or interference with the use of the collateral." The Trust asserted that it was entitled to damages because Mills interfered with the Trust's use of the Building and fixtures by blocking its attempts to rent out the Building. The court denied the Trust's motion, explaining that the Trust offered no authority in support of its "sweeping statements" that any interference with the collateral was actionable and that it was the Trust's burden to establish the elements of the claim. The court noted that the Trust had not established that the property would have been rented if not for Mills's interference. Also in March 2008, the court gave the Trust the exclusive right to market the property.

¶ 17 In April 2009, Mills filed a motion asking the court to determine as a matter of law the date on which the Trust's security interest in the Building and fixtures would expire, arguing that "a reasonable time" had already passed. Mills also filed a motion for partial summary judgment on damages arising from the Trust's claim that Mills interfered with its use of the collateral. Mills asserted that the court should look to tort principles to determine the claim of interference with collateral under the U.C.C., suggesting that the court should require proof akin to tortious interference.

¶ 18 The court ruled that given the depressed real estate market it could not find as a matter of law that a reasonable period of time had expired. The court found that an appropriate "milestone" would be "six months after the current recession ends." The court advised that it would ask the parties to determine how to define that milestone at trial. The court denied Mills's motion for partial summary judgment, stating that under A.R.S. § 47–9102(A)(64)(d) (2005) "proceeds" included the claim for interference with the security interest, but also ruled that the Trust would have to establish that Mills interfered by refusing to rent the property.

¶ 19 The parties agreed that the issues remaining for trial were whether Mills interfered with the Trust's use of its collateral within the meaning of A.R.S. § 47–9102(A)(64)(d), whether a covenant of good faith and fair dealing was implied in the Consent and if so, whether Mills breached it, and whether the Trust was harmed by Mills's conduct, and if so, what the extent of that harm was considering any offsets due to Mills.

¶ 20 A trial to the court was held over two days. With respect to the Trust's claim for damages as supplemental relief to its declaratory judgment action, the court found that tort principles would apply to the Trust's assertion that Mills interfered with its collateral because the U.C.C. did not expressly set forth a legal standard for such interference. The court found that the Trust had failed to prove a claim for tortious interference with a contractual relationship or business expec-

---

1. The court also granted the Trust's motion to dismiss a forcible detainer action filed by Mills, finding that the forcible detainer statute did not apply to the dispute.

tancy because the Trust had not presented a letter of intent from a prospective lessee to Mills for approval. The court further found that even if the Trust had a business expectancy, it had failed to establish that Mills's acts were improper as to motive or means, noting that Mills was as motivated as the Trust to obtain a new tenant and had produced two letters of intent, both of which the Trust had rejected. The court noted that Mills initially refused access for marketing purposes in 2003, but found no evidence that lack of access was the reason prospective tenants failed to provide letters of intent, finding instead that the reason for the lack of a tenant appeared to be the substantial loan and rent payments. The court declared that the Trust bore some responsibility for the absence of a tenant because of its refusal of two prospective tenants in 2007. The court rejected the Trust's argument that Mills's insistence that the Trust cure ESAD's default or enter into a new lease constituted interference, noting that Mills's initial success defending its position in litigation demonstrated that its position had merit. The court concluded that, even if there had been interference, the Trust had failed to show that the interference caused the lack of a tenant.

¶ 21 For the same reasons, the court rejected the Trust's claim for breach of the duty of good faith and fair dealing. The court found that Mills did not interfere with the Trust's rights under the Consent and the lease amendment and did not breach the covenant of good faith and fair dealing by refusing to acknowledge its subordination of interest.

¶ 22 The court rejected Mills's contention that it was entitled to reimbursement from the Trust for certain expenses, finding that as the owner, Mills was responsible for payment of property taxes, maintenance, and other fees and expenses associated with the property. The court further declared that the Trust was required to act in a commercially reasonable manner in disposing of the collateral and found that it was acting in a commercially reasonable manner by marketing the property through a brokerage firm jointly chosen by Mills and the Trust.

¶ 23 The court entered judgment on September 16, 2010. Arizona Mills timely appealed from the judgment and "all intermediate orders involving the merits of the action." The Trust also filed a timely appeal. We have jurisdiction pursuant to A.R.S. § 12–2101(A)(1) (2003).

## DISCUSSION

¶ 24 On appeal from a trial to the court, we are bound by the trial court's findings of fact unless they are clearly erroneous. *Sabino Town & Country Estates Ass'n v. Carr*, 186 Ariz. 146, 149, 920 P.2d 26, 29 (App.1996). We view the evidence and reasonable inferences from that evidence in the light most favorable to the prevailing party and must affirm if any evidence supports the trial court's judgment. *Inch v. McPherson*, 176 Ariz. 132, 136, 859 P.2d 755, 759 (App.1993). We consider legal questions de novo. *Id.* We affirm the trial court if correct for any reason. *Crye v. Edwards*, 178 Ariz. 327, 328, 873 P.2d 665, 666 (App.1993).

¶ 25 In reviewing an order on a motion for summary judgment, we determine de novo whether any genuine issues of material fact exist and whether the trial court properly applied the law. *Eller Media Co. v. City of Tucson*, 198 Ariz. 127, 130, ¶ 4, 7 P.3d 136, 139 (App.2000). We view the facts and the inferences to be drawn from those facts in the light most favorable to the party against whom judgment was entered. *Prince v. City of Apache Junction*, 185 Ariz. 43, 45, 912 P.2d 47, 49 (App.1996).

### The Trust's Appeal

¶ 26 The Trust argues on appeal that the trial court erred in interpreting the term "interference" under A.R.S. § 47–9102(A)(64) as requiring a showing of "tortious interference," that the court erred in finding that Mills's refusal to acknowledge its subordination of interest was not a breach of the covenant of good faith and fair dealing, and that the court erred in finding that the Trust had not proved that Mills's conduct damaged the Trust.

¶ 27 The parties agree that the Trust's security interest in the collateral is

superior to any interest held by Mills, based on this court's prior ruling. The Trust argues that, therefore, under the U.C.C, A.R.S. § 47–9610 (2005), it had the right to use, lease, license or otherwise dispose of the collateral, and that Mills interfered with that right by refusing to allow the Trust to engage in a commercially reasonable effort to market the property to find a new tenant. The Trust further asserts that the U.C.C. provides a remedy for such interference in the form of a damages claim for the revenue it, as creditor, was prevented from obtaining.

¶ 28 The Trust notes that, "A security interest attaches to any identifiable proceeds of collateral." A.R.S. § 47–9315(A)(2) (2005). It then bases its argument that a cause of action exists on the definition of "proceeds" found in A.R.S. § 47–9102(A), which defines terms used in the U.C.C. governing secured transactions. The definition of "proceeds" includes:

> To the extent of the value of collateral, claims arising out of the loss, nonconformity or interference with the use of, defects or infringement of rights in, or damage to the collateral.

A.R.S. § 47–9102(A)(64)(d). The Trust argues that the term "interference" in this definition should be construed broadly using Black's Law Dictionary and that the court erred in applying tort principles and the elements of a tortious interference claim to narrow that broad application. Mills argues that the U.C.C. does not create a cause of action for interference. We agree with Mills.

¶ 29 The interpretation of a statute presents a question of law, which we consider de novo. *Schwarz v. City of Glendale*, 190 Ariz. 508, 510, 950 P.2d 167, 169 (App.1997). Nothing in these provisions creates a statutory cause of action for general interference. They do not impose liability for interference with collateral or authorize recovery of damages for a loss. *Cf.* A.R.S. § 47–9625(B), (D) ("[A] person is liable for damages in the amount of any loss caused by a failure to comply with this chapter."; "A debtor whose deficiency is eliminated. may recover damages for the loss of any surplus."). Rather, these provisions establish that a creditor has a security interest in a claim based on inter-

ference, if such a claim exists. A typical circumstance would involve a tort claim, where the recovery is based on the amount to restore the collateral to its pre-tort value. The secured party would have a security interest in the amount recovered as the claim was based on the loss or damage to the secured party's collateral. *Helms v. Certified Packaging Corp.*, 551 F.3d 675, 678 (7th Cir.2008).

¶ 30 The Trust cites numerous cases for the proposition that the term "proceeds" should be broadly construed. None of the cases, however, support the position that the term "proceeds" can be construed so broadly as to create a statutory cause of action. The cases cited involve circumstances where a creditor was claiming proceeds from an underlying claim, not attempting to prosecute a new claim in the first instance, as here.

¶ 31 The Trust has not identified any other U.C.C. provision as establishing a claim for general interference with collateral, nor has the Trust identified any other basis for, or elements of, such a claim. The Trust argues that the trial court erred in applying the elements of tortious interference, but does not claim that the court erred in concluding that the Trust had not proved that claim.

¶ 32 We find that the definition of "proceeds" in the U.C.C. does not establish a cause of action for general interference and therefore the Trust's action based on the non existent claim properly failed. When the legislature has set forth certain remedies and not others in a comprehensive statutory scheme, we will not imply or interpret additional remedies. *State of Arizona ex rel. Horne v. AutoZone, Inc.*, 227 Ariz. 471, 485, ¶ 49, 258 P.3d 289, 303 (App.2011) (Gemmill, J., concurring in part and dissenting in part) (citing *Ballesteros v. Am. Standard Ins. Co. of Wis.*, 226 Ariz. 345, 349, ¶ 17, 248 P.3d 193, 197 (2011) (court must not rewrite statute); *Rotolo v. San Jose Sports and Entm't, LLC*, 151 Cal.App.4th 307, 59 Cal.Rptr.3d 770, 782 (2007) (rule of judicial restraint disallows court to "fill a void" in statutes, especially where legislature's provisions are comprehensive and detailed)), *vacated in part by State of Arizona ex rel. Horne v. AutoZone, Inc.*, 229 Ariz. 358, 275 P.3d 1278 (2012).

"[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.'" *AutoZone*, 229 Ariz. at 362, ¶ 19, 275 P.3d at 1282 (quoting *Lancaster v. Ariz. Bd. of Regents*, 143 Ariz. 451, 457, 694 P.2d 281, 287 (App.1984)).

■ ¶ 33 Even if the Trust could have brought such a claim, we find that the trial court did not clearly err in concluding that the Trust had failed to show that any interference by Mills caused the Trust to lose the rental income it claimed.

¶ 34 The Trust argues that in reaching its conclusion the trial court must have ignored the unrebutted testimony of the Trust's valuation expert, Gladstone Gregg. The fact finder is the sole judge of the facts and the credibility of the witnesses, and a trial court is not bound by even the uncontradicted evidence of a disinterested witness. *Walsh v. Advanced Cardiac Specialists Chartered*, 227 Ariz. 354, 361, ¶¶ 23–24, 258 P.3d 172, 179 (App.2011). The weight to be given to expert testimony is likewise within the purview of the fact finder. *State v. Sisk*, 112 Ariz. 484, 485, 543 P.2d 1113, 1114 (1975).

¶ 35 In 2006, Gregg performed a retrospective appraisal. Gregg opined that, during the summer of 2003, if the property had been exposed for approximately six months in a commercially reasonable marketing effort, a tenant would have been located who would have paid $257,140 per year, or $32.50 per square foot based on comparable properties. He also testified, however, that his assignment was to assume Bennigan's as a tenant and determine what another Bennigan's franchisee would have paid for the space, that the rate for a second-generation renter[2] of a comparable space was approximately $22.09 per square foot, and that the second generation renter had also required additional concessions from the landlord.

¶ 36 Edward Schwartz, a representative of the Trust, testified that he had been told in May 2003 that the Trust would be denied access to market the property because the

Trust had not cured the outstanding obligations of the debtor. However, he also testified that he nevertheless attempted to find a tenant, especially with Bennigan's, but was unsuccessful, and that he had since learned of problems with Bennigan's infrastructure related to store operations. The court also heard evidence that two individuals expressed interest in the property and that one lost interest because of the existing debt, which the Trust would not forgive, and the other wanted to negotiate a reduction in rent, which the Trust was unwilling to discuss, at least until other matters had been addressed. Mills had arranged to grant one of the prospective tenants access to the property. Schwartz also testified that he had no information that Mills had interfered with either of those prospective tenants. Schwartz testified, and the court found, that he would have accepted less than the prior tenant's $54.84 per square foot rate, which was based on the rent and loan payments, but he did not testify as to what rate he would have accepted.

¶ 37 We first note that the court did not ignore Gregg's testimony. The court acknowledged his testimony and found, based on his opinion, that the market rate for the property was $32.50 per square foot. Given the other testimony, however, the court could have found not credible Gregg's opinion that, had the property been commercially marketed for six months, a tenant would have been found and the property would have been rented at that rate.

¶ 38 Gregg's opinion was based on Bennigan's as a tenant, the evidence was that Bennigan's was unlikely to take over the property at that time, the second generation rental value based on comparable property was even less at $22.09 than the market rate of $32.50, and although Schwartz had said he would have accepted less than the $54.84 per square foot rate of the prior tenant, there was no evidence that he would have accepted $32.50 or $22.09 per square foot. The court also knew that in 2007, the Trust had rejected offers of $140,000 per year or $17.69 per

---

**2.** A second-generation renter is a renter for which the premises had not been built to suit but that takes over a property that had been built for a prior tenant.

square foot, and $185,000 per year or $23.38 per square foot.

¶ 39 We cannot find that the trial court clearly erred when it concluded that the Trust had not shown that interference by Mills caused the lack of a new tenant for the property.

¶ 40 The Trust also argues that the court erred in finding that Mills had not breached the implied covenant of good faith and fair dealing. The Trust bases its claim on its assertion that Mills refused to recognize its superior interest in the collateral under the Consent.

¶ 41 Implied in every contract is a covenant of good faith and fair dealing, which requires each contracting party to refrain from acting in a manner that would impair the right of the other to receive the benefits of their agreement. *Rawlings v. Apodaca*, 151 Ariz. 149, 153, 726 P.2d 565, 569 (1986). A party breaches the covenant by denying the other party the "reasonably expected benefits" of the contract. *Nolan v. Starlight Pines Homeowners Ass'n*, 216 Ariz. 482, 489, ¶ 27, 167 P.3d 1277, 1284 (App.2007). Whether a party breached the implied covenant is a question of fact, and we will not set aside a trial court's decision on that point unless clearly erroneous. *Maleki v. Desert Palms Prof'l Props., L.L.C.*, 222 Ariz. 327, 333, ¶ 28, 214 P.3d 415, 421 (App.2009).

¶ 42 The Trust argues that Mills wrongly insisted that it cure ESAD's default and assume the lease, wrongly asserted that the Trust had to remove the collateral, and wrongly refused to recognize its own agreement in the Consent to subordinate its interest in the collateral to the Trust. The Consent, however, articulated certain remedies available to the Trust in the event of a default, including curing the default within the cure period and taking possession under the lease, and removing the collateral with an obligation to pay rent required under the lease for the period during which the Trust was on the property. Mills's position was not inconsistent with the terms of the Con-

sent. The superior court initially found that the Consent was reasonably susceptible to Mills's interpretation. That this court eventually determined that the Trust had the superior interest in the collateral does not make Mills's prior efforts to enforce its interpretation of the Consent acts of bad faith.[3] The Trust has cited no other evidence to support a claim for breach of the covenant of good faith and fair dealing. We find no clear error in the trial court's ruling that Mills did not breach the duty of good faith and fair dealing.

¶ 43 We affirm the trial court's ruling with respect to the Trust's claims of error.

**Mills's Appeal**

¶ 44 We first address Mills's argument that the trial court erred in denying its motion for partial summary judgment, which argued that the revised version of U.C.C. Article 9 was inapplicable and that its retroactive application constituted an unconstitutional impairment of Mills's contract rights under the Consent. The trial court found that the revised Article 9 was expressly made retroactive by A.R.S. § 47–9702 (2005), and that retroactive application was not unconstitutional because rights under the agreements did not vest until after the default.

¶ 45 Arizona adopted the revised U.C.C. Article 9 with an effective date of July 1, 2001. A.R.S. §§ 47–9101 to –9709 (2005 and Supp. 2010). Under the prior version, upon default, a secured party could remove the collateral. A.R.S. § 47–9313(H) (1997). After revision of Article 9, a secured party "may sell, lease, license or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing." A.R.S. § 47–9610(A). Mills argues that, because the Consent was executed prior to the effective date of the revisions, the limited remedies of the prior version and not the expanded remedies of the revised version apply.

¶ 46 Mills argues that revised Article 9 does not apply retroactively. Although

---

3. *Cf. Lennar Corp. v. Transamerica Ins. Co.*, 227 Ariz. 238, 243, ¶ 17, 256 P.3d 635, 640 (App. 2011) (that trial court initially, but erroneously, agreed with proponent's interpretation of a contract does not necessarily prove absence of bad faith).

statutes pertaining to procedural law may be applied retroactively, generally a statute does not apply retroactively to substantive rights unless the legislature expressly provides for retroactive application. A.R.S. § 1-244 (2002); *Aranda v. Indus. Comm'n,* 198 Ariz. 467, 470, ¶¶ 10–11, 11 P.3d 1006, 1009 (2000). Here, the legislature expressly stated that the revised version of Article 9 was to be applied retroactively. "Except as otherwise provided in this article, this chapter applies to a transaction or lien within its scope, even if the transaction or lien was entered into or created before this chapter takes effect." A.R.S. § 47-9702(A).

¶ 47 Mills argues that this provision, part of a section called the "Savings Clause," applies only to procedural matters. Mills asserts that it is part of Section 7 of the revised Article 9, which provides for transition to new procedures for filing and perfecting security interests, and that there is no provision for retroactively applying revised Article 9 to nonprocedural rights.

¶ 48 By its plain language, the statute's application is not limited as suggested by Mills. *See Janson v. Christensen,* 167 Ariz. 470, 471, 808 P.2d 1222, 1223 (1991) (we give effect to the plain language of the statute). The statute provides that "this chapter applies" to transactions entered into before "this chapter takes effect." "This chapter" refers to the entirety of Article 9, governing secured transactions. A.R.S. § 47-9702(A).

¶ 49 Mills also contends that retroactive application of Article 9 would effect an unconstitutional abrogation of Mills's substantive contract rights. A law impairs a contract when it deprives a party of the benefit of his contract. *Tower Plaza Invs. Ltd. v. DeWitt,* 109 Ariz. 248, 252, 508 P.2d 324, 328 (1973). Mills contends that the Consent established the limits of its subordination and the remedies available to the Trust in the event of default. Mills appears to argue that applying the revised Article 9 expands the rights of the Trust beyond the limitations agreed in the Consent, thereby impairing the contract. The language of the Consent does not support Mills's characterization of the agreement.

¶ 50 Under the Consent, Mills subordinated "each and every right" it had in the collateral. Mills also agreed to allow the Trust on the property to deal with the collateral under certain conditions, and agreed to give the Trust the right, but did not impose the obligation, to cure ESAD's default and take possession under the lease. The Consent did not, however, include any language by which the Trust agreed to be limited to these remedies. Except for one provision whereby the Trust agreed not to conduct an auction of the collateral from the premises and another by which the Trust agreed to pay rent when on the premises in certain circumstances dealing with the collateral, the Consent is in the form of Mills's consent to various conditions and actions by the Trust, with no affirmative agreements by the Trust.

¶ 51 To the extent that Mills is arguing that the application of the revised Article 9 impairs its right to the limitations of available remedies under the Consent, the Consent does not demonstrate such a right existed to be impaired.

¶ 52 Mills cites *Kresos v. White,* 47 Ariz. 175, 54 P.2d 800 (1936), as support for its argument that security rights are part of a contract when executed and cannot be impaired by subsequently enacted legislation. In *Kresos,* defaulted mortgagors appealed from a deficiency judgment entered against them after a foreclosure, arguing that a law enacted after the mortgage was executed precluded the deficiency judgment. 47 Ariz. at 176–77, 54 P.2d at 801. The court found that the rights of the parties vested at the time the contract was made and that the law precluding the deficiency judgment impaired the contract. The court reasoned that the mortgagee had paid the funds when the mortgage was executed and so the rights and obligations arose at that time. *Id.* at 178–79, 54 P.2d at 802. The rights involved were the mortgagee's right to be repaid and the mortgagors' obligation to repay the debt. The subsequently enacted statute impaired the contract because it alleviated the mortgagors' obligation on the contract to repay the debt. *Id.* at 179, 54 P.2d at 802. Mills has not identified comparable rights and obligations

under the Consent that would be impaired by the application of the revised Article 9.

¶ 53 Even if the Consent contained a limitation on remedies, any such right was not vested. A substantive legal right may be impaired retroactively before it becomes a vested right. *Aranda*, 198 Ariz. at 471, ¶ 16, 11 P.3d at 1010. "[L]egislation may not disturb vested substantive rights by retroactively changing the law that applies to completed events." *San Carlos Apache Tribe v. Superior Court*, 193 Ariz. 195, 205, ¶ 15, 972 P.2d 179, 189 (1999). A right vests "when every event has occurred which needs to occur to make the implementation of the right a certainty" or when it "is 'actually assertable as a legal cause of action or defense or is so substantially relied upon that retroactive divestiture would be manifestly unjust.'" *Aranda*, 198 Ariz. at 471, ¶ 18, 11 P.3d at 1010 (quoting *San Carlos*, 193 Ariz. at 200, 972 P.2d at 184).

¶ 54 The right Mills claims concerns remedies that would not go into effect unless and until ESAD defaulted. Consequently, the right was not vested.[4]

¶ 55 We find no error by the court in denying Mills's motion for partial summary judgment to declare that the revised Article 9 did not apply.

¶ 56 Mills argues that the trial court erred in granting the Trust's motion for partial summary judgment on Mills's counterclaims based on this court's decision declaring that the Trust had a superior interest in the collateral. The superior court had found that "based on the Court of Appeals having found [the Trust's] security interests in the building and improvements superior to any interests of Arizona Mills, that there are no issues of fact or law to preclude granting summary judgment and dismissing the counterclaims." Mills contends that its counterclaims for trespass, breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment pertained to its interest in Lot 4, not the collateral, and therefore were not affected by the ruling from this court.[5]

¶ 57 There appears to be no dispute that the Trust has no interest in Lot 4. There also appears to be no dispute that Mills owns the Building and fixtures that represent the collateral that is on Lot 4.

¶ 58 Mills's counterclaims for trespass and unjust enrichment arise out of the Trust's failure to remove the collateral from Lot 4. Mills contends that the Trust is trespassing because it continues to leave the collateral on Lot without Mills's consent. Mills argues the Trust is unjustly enriched and Mills is impoverished because the Trust is storing its collateral on Lot 4 without paying rent and the Trust's unauthorized use of Lot 4 is precluding Mills from receiving rent from the property.

¶ 59 Mills does not explain, however, how it can maintain these actions based on the presence of the collateral on Lot 4 when it—Mills—owns the collateral. Mills cites *Myers v. Fifth Third Bank* in support of its claim that it constitutes unjust enrichment for a creditor to leave collateral on leased premises without paying the obligations of the lease. 89 Ohio App.3d 344, 624 N.E.2d 748, 750 (1993). In that case, the owner of the leased premises did not also own the collateral. *Myers*, 624 N.E.2d at 749. Mills does, in its reply brief, briefly assert that the Trust was in control of the collateral or that a fact question exists regarding that control; Mills does not elaborate as to how that fact affects these claims.

¶ 60 Given that Mills owns the collateral that is on its own land, the actual dispute

4. We note, too, "parties have no vested right in particular remedies or modes of procedure, and ... legislatures may change existing remedies or prescribe new modes of procedure without impairing the obligation of the contracts, provided the efficacious remedy remains for enforcement." *Samaritan Health Sys. v. Superior Court*, 194 Ariz. 284, 294, 981 P.2d 584, 594 (App.1998) (citation omitted).

5. The Trust contends that this issue has been decided because Mills presented evidence and argument at trial regarding reimbursement of expenses to offset damages claimed by the Trust. The court found that Mills was responsible for the charges and expenses related to the property. The court did not address the claims in the counterclaims by which Mills asserts that the Trust owes it for the unauthorized use of Lot 4.

would appear to arise out of the Trust's assertion of its priority security rights. We find no error in the trial court's decision granting summary judgment on these counterclaims in favor of the Trust in light of this court's determination that the Trust's security interest was superior to Mills's.

¶ 61 Mills also maintains that the trial court erred in granting summary judgment to the Trust on Mills's counterclaims for breach of contract and breach of the covenant of good faith and fair dealing. Those claims are based on Mills's assertion that the Consent represents the agreement of the parties that the Consent required the Trust to either remove the collateral and discontinue use of Lot 4 or cure the default and obtain a leasehold interest in Lot 4, and that the Consent does not otherwise grant the Trust any interest in Lot 4. Mills asserts the Trust is breaching the Consent and the covenant of good faith and fair dealing because the Trust's actions assert an interest in Lot 4 without complying with the express or implied terms of the Consent.

¶ 62 The Trust was not obligated by the Consent to either remove the collateral or cure the debt and obtain a new lease; it therefore could not breach the Consent by its failure to choose either of those options. In addition, although the Consent permitted the Trust to use Lot 4 by curing the debt and leasing the property, it does not otherwise prohibit the Trust's use of the property; therefore, the use alleged by Mills could not be a breach of the contract.

 ¶ 63 Mills also contends that the trial court erred in denying its Motion to Compel Disposition of Property, declining to find that the Trust's priority had expired. Mills had sought a determination that the Trust's security interest had expired because a reasonable time for disposition of the collateral had passed. In December 2009, the court ruled that it could not find as a matter of law that a reasonable time had passed considering the depressed real estate market in Arizona. The court acknowledged that the period of time for the Trust to find a tenant could not last forever and proposed that six months after the recession ends would be "an appro-

priate milestone" to find that a reasonable time had expired.

¶ 64 Mills argues that the Trust's security interest is limited to a "reasonable time" under A.R.S. § 47–9334(G), and that the reasonable time has expired as a matter of law. Section § 47–9334(G) provides: "The priority of a security interest under subsection F, paragraph 2 of this section continues for a reasonable time if the debtor's right to remove the goods as against the ... owner terminates." Subsection F provides:

A security interest in fixtures ... has priority over a conflicting interest of an ... owner of the real property if:

1. The ... owner has consented ... to the security interest ...; or

2. The debtor has a right to remove the goods as against the ... owner.

A.R.S. § 47–9334(F). The Trust argues, and we agree, that because this court found that the Trust's priority arises under both subsections (F)(1) and (F)(2), the "reasonable time" limitation does not apply because it does not apply to subsection (F)(1). Mills consented to the Trust's superior security interest; this statute does not provide that an interest created by consent expires after a reasonable time. We therefore decline to find as a matter of law that the Trust's priority security interest has expired.

¶ 65 Under A.R.S. § 47–9610, however, "Every aspect of a disposition of collateral, including the method, manner, time, place and other terms, must be commercially reasonable." A.R.S. § 47–9610(B).

A disposition of collateral is made in a commercially reasonable manner if the disposition is made:

1. In the usual manner on any recognized market;

2. At the price current in any recognized market at the time of the disposition; or

3. Otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

A.R.S. § 47–9627(B) (2005). A disposition may still be commercially reasonable even if a greater amount could have been obtained by a disposition at a different time or in a

different method from that selected by the secured party. A.R.S. § 47–9627(B).

¶ 66 Mills argues that the court's ruling setting the deadline for a reasonable time as six months after the end of the recession is improper and does not comply with the requirement to dispose of the collateral in a commercially reasonable manner.

¶ 67 We agree that a set date does not comply with the commercially reasonable standard. First, we note that A.R.S. § 47–9627(A) and (B) suggest that disposition of property can be commercially reasonable in any market, even if a greater amount could be secured by waiting for a change in the market. In addition, whether the Trust has acted in a commercially reasonable manner in attempting to lease the property depends on various factors, for example, what steps the Trust has taken to lease the property, what rate has been sought and methods used and whether they are consistent with the market, and whether any offers have been received and if rejected, why.

¶ 68 The trial court retained jurisdiction to address further issues related to the disposition of the collateral. We remand to the trial court for such further proceedings in light of these instructions, including a determination of commercial reasonability.

¶ 69 Both parties seek an award of attorneys' fees pursuant to A.R.S. § 12–341.01. We decline to award fees.

### CONCLUSION

¶ 70 We affirm the trial court's judgment after a bench trial in favor of Arizona Mills on the Trust's claims for supplemental relief and for breach of the implied covenant of good faith and fair dealing. We also affirm the court's rulings finding that the revised version of Article 9 of the U.C.C. applies and granting partial summary judgment in favor of the Trust on Mills's counterclaims. We remand for further proceedings related to the disposition of the collateral.

CONCURRING: MAURICE PORTLEY, and JOHN C. GEMMILL, Judges.