NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

EMAD ZAKI, *Plaintiff/Appellee*,

*v.*

CAPSTONE ASSET MANAGEMENT LLC, *Defendant/Appellant*.

No. 1 CA-CV 19-0263
FILED 3-5-2020

Appeal from the Superior Court in Maricopa County
No. CV2018-002073
No. CV2018-004485
The Honorable Roger E. Brodman, Judge

**AFFIRMED**

COUNSEL

Paul M. Levine, P.C., Scottsdale
By Paul M. Levine
*Counsel for Plaintiff/Appellee*

Engelman Berger, P.C., Phoenix
By Wade M. Burgeson
*Counsel for Defendant/Appellant*

---

## MEMORANDUM DECISION

Presiding Judge Paul J. McMurdie delivered the decision of the Court, in which Judge Jennifer B. Campbell and Vice Chief Judge Kent E. Cattani joined.

---

**M c M U R D I E**, Judge:

**¶1** Capstone Asset Management, L.L.C. ("Capstone") appeals the superior court's order granting a permanent injunction for specific performance for the sale of two commercial properties to Emad Zaki and awarding Zaki his attorney's fees and costs. We affirm.

### FACTS AND PROCEDURAL BACKGROUND

**¶2** Min Kim is the manager of Capstone.[1] On January 3, 2018, Capstone and Zaki entered a real estate contract whereby Zaki agreed to purchase two commercial condominiums from Capstone for $405,000. The agreement: (1) required Zaki to pay a $5000 earnest money deposit and the remaining balance at close of escrow; (2) selected Greystone Title Agency ("Greystone") to serve as the escrow agent; and (3) stated that Capstone was obligated to provide Zaki title insurance at the close of escrow. The contract contained a buyer disapproval clause, which provided if Zaki "disapproves of the property" he could immediately cancel the contract without consent from Capstone or deliver written notice of the items he disapproved of to Capstone. If Capstone did not agree or was unable to resolve the conflict, Zaki could cancel the contract and retain his deposit, or proceed as is with the transaction. The agreement provided that the failure to give written notice of cancellation or disapproval was deemed an election to proceed with the contract. The parties also included a time-is-of-the-essence provision. For the transaction, Capstone used Brett

---

[1] Min Kim told his broker and others that he had a terminal illness and that his father—Andrew Kim—and his sister would be handling his properties. But Min Kim is alive, and the superior court found that he handled the communications during the relevant times in question via email impersonating his father. Given the superior court's finding, we refer to all communications as coming from Min Kim.

Isbell as its broker. Zaki did not have a broker. Greystone opened escrow, and Zaki paid the $5000 deposit.

¶3          The condominiums are part of a seven-unit association called the Camino Medical Property Owners Association (the "Association"). The Association is headed by its President, Kerry Giangobbe, who owns the other five units.

¶4          On January 9, Greystone sent Giangobbe a one-page questionnaire, requesting information about the Association and property. Greystone needed the answers to the questionnaire to close escrow. The questionnaire asked for such information as the existence of fees and whether a buyer was required to be approved by the Association before closure. The questionnaire identified Zaki as the buyer, Capstone as the owner, and stated that the escrow was scheduled to close on February 28, 2018. Giangobbe did not respond to the questionnaire. Greystone re-sent the questionnaire to Giangobbe on January 19, 2018.

¶5          Isbell, on behalf of Capstone, also sent a questionnaire to Giangobbe on January 18, informing her that to close escrow, she needed to complete it and provide a copy of the Association's Covenants, Conditions, and Restrictions ("CC&Rs") and bylaws. On January 24, 2018, Isbell again sent the questionnaire and requested a copy of the Association's budget. Instead of answering the questionnaire and providing the CC&Rs and bylaws, Giangobbe demanded that both Zaki and Kim call her to address concerns she had about Zaki because "[h]is phone and current employment does not exist." She claimed that the Association had a non-compete clause restricting the use of the properties, and she needed to approve the buyer before supplying the information necessary to close escrow.

¶6          Isbell also emailed Kim, provided him with Giangobbe's phone number, and encouraged him to call her "as soon as possible to avoid more stress on [Zaki]." When Kim did not contact Giangobbe, Isbell emailed Kim again stating, "your assistance may be needed in order to resolve this matter." On January 30, Giangobbe complained to Isbell that Kim had not called her and demanded he do so. Isbell emailed Kim stating he "should probably speak to her as soon as possible. She is very combative and is putting this deal in jeopardy."

¶7          Finally, on January 30, Giangobbe emailed Kim. In the email, Giangobbe gave Kim her phone number and told him to contact her "at [his] earliest convenience." The next day, Kim responded to the email and stated he would call her that day. Kim then sent two emails to Giangobbe

informing her that he was out of the country and unable to find someone who sold an international calling card. He asked her to communicate via email because his written English skills were better than his spoken English. Giangobbe repeatedly asked Kim to call her and requested more information about Zaki in multiple emails over the next few days. She also stated that Zaki had no right to any of the asked for financial information. Kim avoided the request to call Giangobbe again by stating: "I have not been able to find a way to call you from here. The earliest I am scheduled to return is next week and there is a possibility of my trip being delayed, depending on how things work out here."

¶8 Growing frustrated with Giangobbe's resistance and Zaki for not wanting to provide more information about himself to Giangobbe, Kim decided to "press the matter." On February 5, he emailed Giangobbe, stating he had the right as an "owner and member of the [A]ssociation" to obtain the information requested and was prepared to sue her if she did not provide the necessary information and documents. He also informed Giangobbe that his copy of the CC&Rs did not mention a non-compete or a right to approve a buyer. The next day, Giangobbe offered to "set up a meeting at our attorney's office" and gave Kim the Association's attorney's contact information. On February 18, Capstone and Zaki extended the feasibility period to March 15 and close of escrow to April 3, 2018.

¶9 On March 14, Giangobbe emailed Kim and asked why he had not contacted the Association's lawyer yet. Despite more than a dozen requests by Giangobbe for Kim to call her or the Association's attorney, he never did. On March 20, Isbell contacted the Association's attorney, and two days later, Giangobbe filled out the questionnaire. However, the Association incorrectly claimed its Board of Directors had the right to review and approve the deal before it closed. The next week, Kim's and the Association's attorneys "agreed the Association does not have veto power over prospective buyers" and that the Association's attorney would try to provide a corrected questionnaire. Before he could give the correct information, the Association hired new counsel, and Giangobbe insisted that the Board had 30 days to approve Zaki.

¶10 Aware that escrow was not going to close on time, Zaki and Kim began negotiating alternative ways to transfer the properties. Negotiations broke down over who was to pay the transfer fees, Zaki's refusal to deposit additional funds into escrow, and Kim's insistence not to provide the title insurance. The parties failed to reach an agreement, and escrow did not close on April 3, 2018. Three days later, Kim emailed Isbell stating, "I feel the Camino property is underpriced." Later that week, Kim

requested that the asking price of the properties be increased by $145,000. Eventually, Kim increased the asking price to $875,000, more than double the original contract price with Zaki.

¶11　　　Relations between Kim and Zaki continued to deteriorate, eventually resulting in both parties suing the other for breach of contract and breach of the covenant of good faith and fair dealing. Zaki argued Capstone was obligated to do more to get the Association to comply with Greystone's request for information, Capstone acted unreasonably, and escrow should have been extended to allow Zaki an opportunity "to complete his due diligence." Zaki requested specific performance and an award for his attorney's fees and costs per the terms of the contract. Capstone argued that escrow failed to close on time, Zaki never made the written disapproval required under the contract, and Zaki refused to deposit additional funds into the escrow which could have extended the time to close.

¶12　　　The superior court held an evidentiary hearing on Zaki's application for permanent injunction for specific performance. After the hearing, the court granted the permanent injunction. The court concluded Capstone's original owner, Kim, faked his death and was the person sending the emails pretending to be his father. The court stated "one of the reasons Ms. Giangobbe was so difficult was because she felt that she was getting the runaround" by Kim, who refused to call her and only offered "lame excuses in the process," and by Zaki, who she claimed had lied to her and whose "true intent was to move his wife's ophthalmology practice to the Property. . . . [when] there already was an ophthalmology practice in the Association." The court found that Capstone materially breached the purchase contract because it "did not act reasonably or timely in dealing with the Association and that [Capstone's] conduct was itself an action that was beyond the risks [Zaki] assumed in the contract." It also found Zaki was "not at fault for the failure to close escrow on April 3 and therefore not in material breach of the contract." The court ordered that Zaki was entitled to specific performance of the contract and awarded him attorney's fees and costs. Capstone appealed the decision and we have jurisdiction under Arizona Revised Statutes ("A.R.S.") sections 12-2101(A)(1) and -2101(A)(5)(b).

**DISCUSSION**

¶13　　　Following a bench trial, we view the facts in the light most favorable to affirming the court's ruling. *Bennett v. Baxter Grp., Inc.*, 223 Ariz. 414, 417, ¶ 2 (App. 2010). We review *de novo* contract interpretation.

*Grosvenor Holdings, L.C. v. Figueroa*, 222 Ariz. 588, 593, ¶ 9 (App. 2009). "Implied in every contract is a covenant of good faith and fair dealing, which requires each contracting party to refrain from acting in a manner that would impair the right of the other to receive the benefits of their agreement." *FL Receivables Tr. 2002-A v. Ariz. Mills, L.L.C.*, 230 Ariz. 160, 169, ¶ 41 (App. 2012). Determining whether a party breached the covenant of good faith and fair dealing is a fact question, which we will not disturb unless the court's finding was clearly erroneous. *Wells Fargo Bank v. Ariz. Laborers Local No. 395 Pension Tr. Fund*, 201 Ariz. 474, 493, ¶¶ 69–70 (2002); *Maleki v. Desert Palms Prof'l Props., L.L.C.*, 222 Ariz. 327, 333, ¶ 28 (App. 2009).

## A. The Superior Court Did Not Err by Concluding Capstone Materially Breached the Implied Covenant of Good Faith and Fair Dealing.

**¶14** The superior court concluded Capstone breached the covenant of good faith and fair dealing when it: (1) failed to timely and reasonably deal with the Association, and (2) insisted the purchase contract was no longer valid when escrow did not close on April 3. The court reasoned that the Capstone breach was material, thus excusing Zaki from performance.

### 1. Capstone Violated the Covenant of Good Faith and Fair Dealing.

**¶15** A party breaches the implied covenant of good faith and fair dealing when one party exercises discretion retained or not foreclosed under a contract in such a way as to deny the other a reasonably expected benefit of the bargain. *Sw. Sav. & Loan Ass'n v. SunAmp Sys., Inc.*, 172 Ariz. 553, 558–59 (App. 1992). "The implied covenant of good faith and fair dealing prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement. The duty arises by operation of law but exists by virtue of a contractual relationship." *Wells Fargo Bank*, 201 Ariz. at 490, ¶ 59. "[O]ur supreme court has warned that in determining contract rights, courts are not constrained by textual omissions to abandon common sense and experience or to ignore the surrounding circumstances of an agreement." *SunAmp Sys.*, 172 Ariz. at 560.

**¶16** There is sufficient evidence to demonstrate that Capstone materially breached the contract. First, Kim acknowledged Zaki had no rights to obtain documents from the Association and was aware the

Association would only be responsive to the owner of the property. Yet, despite more than a dozen requests by Giangobbe for Kim to call her, he refused to call and only offered unconvincing excuses. Kim never called and made no contact with the Association or its attorney from February 6 to March 20. However, when Capstone's broker finally contacted the Association's attorney, the questionnaire was completed two days later. Had Capstone made a reasonable effort to communicate with Giangobbe and the Association, the deal may have closed as scheduled.

¶17 Capstone, through Kim, contributed significantly to the Association's delay and ignored Isbell's advice to extend the close of escrow. Capstone also tried to negotiate an unreasonable deal to sell the properties for cash without the use of title insurance. The deal was so unreasonable Isbell testified he never thought to suggest it because he had "never seen that happen" in eight years of experience and approximately 500 transactions. Capstone also attempted to sell the commercial properties to Giangobbe while the sale was pending, but the asking price was more than Giangobbe could afford.

¶18 Weeks before the April deadline for closing escrow, Kim told Isbell: "Please do not send me any further updates on [Zaki and Giangobbe], or their shenanigans. Escrow has been terminated, he has rejected all available paths forward, and his chance to buy the property has been lost. This is a complete waste of our time now." Isbell responded, "I don't know how you can terminate escrow until [Zaki] is in some sort of default though. Which I don't believe has happened, at least not yet." Within days of the scheduled sale to Zaki falling through, Kim stated the properties were worth more. Isbell noted the property was priced reasonably and should not be increased because of the unfriendly seller's market, but Capstone still raised the price of the properties by $145,000 later that week and by $470,000 by the time of trial.

¶19 It was reasonable for Zaki to rely on Capstone to timely deal with the Association if Capstone was the only one with rights to the necessary information. Instead of making a phone call to ease Giangobbe's concerns, Capstone manipulated its bargaining power amidst the chaos to deny Zaki his reasonably expected benefit of the bargain. *See Wells Fargo Bank*, 201 Ariz. at 490, ¶ 59. Although it was not necessarily unreasonable for Kim to express a desire to communicate with the Association in writing rather than by phone, Kim's less-than-forthright dealings with Giangobbe significantly contributed to the delay in closing. Thus, the court did not abuse its discretion by finding Capstone materially breached the contract by violating the implied covenant of good faith and fair dealing.

## 2.    The Court's Conclusion Did Not Contradict the Express Terms of the Contract.

¶20        Capstone argues the superior court erred by "skipp[ing] the initial analytical step of first determining what contractual duties existed under the [agreement]." Capstone contends the utilization of the implied covenant: (1) ignored the contractual obligations put on Zaki, (2) improperly forced Capstone to deal with the unreasonably combative Association, and (3) prevented Capstone from using a provision directly expressed in the contract. Based on these errors, Capstone reasons it did not materially breach the contract, and the court should have found Zaki materially breached his contractual obligations because escrow did not close. We disagree.

¶21        "The purpose of contract interpretation is to determine the parties' intent and enforce that intent." *Figueroa*, 222 Ariz. at 593, ¶ 9. To establish a breach of contract, the plaintiff must prove that: (1) a contract existed, (2) the defendant failed to perform its obligation under the contract; and (3) the failure resulted in damages. *Graham v. Asbury*, 112 Ariz. 184, 185 (1975). The court may make equitable considerations to determine whether the contract has been breached, including: "the parties' relative hardships, the parties' misconduct, public interest, and adequacy of other remedies." *Swain v. Bixby Vill. Golf Course Inc.*, 247 Ariz. 405, 413, ¶ 33 (App. 2019).

¶22        A party may breach the implied covenant of good faith and fair dealing "even if the express terms [of the agreement] speak to a 'related subject.'" *Bike Fashion Corp. v. Kramer*, 202 Ariz. 420, 424, ¶ 17 (App. 2002). "The duty of good faith extends beyond the written words of the contract. . . . [A] party may nevertheless breach its duty of good faith without actually breaching an express covenant in the contract." *Wells Fargo Bank*, 201 Ariz. at 491, ¶¶ 63–64. Although the covenant of good faith and fair dealing "cannot directly contradict an express contract term," a party can breach the implied covenant "both by exercising express discretion in a way inconsistent with a party's reasonable expectations and by acting in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain." *Kramer*, 202 Ariz. at 423–24, ¶ 14. Implied contractual terms "are as much a part of a contract as are the express terms." *Wells Fargo Bank*, 201 Ariz. at 490, ¶ 59.

¶23        First, Capstone argues that the contract "makes clear that Zaki had the ability to issue written 'disapprovals,' which Capstone could elect to correct or not correct. . . . Zaki could then either cancel the contract or

proceed to closing." Therefore, because Zaki did not cancel escrow, he continued at his own risk. After proceeding at his own risk, Capstone maintains that Zaki could have fully funded escrow if he wanted to extend the deadline to close, but by not doing so, Zaki materially breached when Capstone rightfully enforced the time-is-of-the-essence clause.

¶24 It is uncontested that escrow never closed. However, Zaki had the right to assume Capstone would timely deal with the Association to achieve escrow closure. *See Kramer*, 202 Ariz. at 423, ¶ 14. No additional duties were mandated upon Capstone by the court outside of the commitments already implied in the contract. *See SunAmp Sys.*, 172 Ariz. at 558–59. The fact that Zaki had duties under the contract to make written complaints about his disapproval of the property does not negate Capstone's obligations to act in good faith under the implied covenant. *See id.*; *Nolan v. Starlight Pines Homeowners Ass'n*, 216 Ariz. 482, 489, ¶ 27 (App. 2007).

¶25 Next, Capstone claims the Court's findings concerning the Association's irrational behavior means Capstone was not in breach when escrow failed to close. Although the court found that the Association acted unreasonably and Zaki failed to timely close, substantial evidence supports the court's conclusion that Capstone did not reasonably and timely deal with the Association, obligations it had under the implied covenant. The superior court did not "force" Capstone to deal with the combative Association as it claims. The court explicitly stated Capstone was not obligated "to sue the Association or to take extraordinary efforts to force the Association to behave," but instead found an obligation "to act reasonably and timely when dealing with the Association." The court held that Capstone should have done more to ease the Association's concerns and doubts instead of avoiding communication.

¶26 Finally, Capstone claims the court erred when it found Capstone materially breached by exercising its right to use the time-is-of-the-essence provision under the contract. The court's ruling did not contradict the time-is-of-the-essence requirement because Capstone's improper behavior did not occur when it utilized the contract provision as Capstone claims. Instead, Capstone breached the implied covenant when it employed the clause to get out of the sale, knowing the Association had lied on the questionnaire. Capstone not only knew of the false information on the questionnaire but also demonstrated its eagerness to break the agreement with Zaki to sell the property for more money. Therefore, requiring Capstone to act in good faith did not contradict the terms of the

contract or prohibit Capstone from exercising its rights under the agreement. *See Nolan*, 216 Ariz. at 489, ¶ 27.

### 3. Capstone's Material Breach Excused Zaki's Failure to Timely Close.

**¶27** During the trial, Zaki testified that he was ready, financially able, and willing to close but would not negotiate a new deal without title insurance. Zaki stated he did not want to deposit the remaining $405,000 into escrow because the exact amount was not known, he did not want his money tied up if escrow was unlikely to close, and he did not want the funds to be released directly to Kim without title insurance. Based on these reasons, the superior court concluded Capstone's material breach excused Zaki's funding of escrow, and Zaki was neither at fault for the failed closing of escrow nor required to fund escrow when it would have been futile.

**¶28** The evidence supports the superior court's conclusions. As discussed above, Capstone failed to timely deal with the Association and used the contract's time-is-of-the-essence clause in bad faith. Meanwhile, Zaki was deprived of his rights under the contract because: (1) he was ready, able, and willing to close, (2) his demand for title insurance and concern about having his money tied up was reasonable in such an unusual transaction where Capstone's broker had concerns over Kim's alleged faking of his death and email impersonations, and (3) if Zaki had fully funded escrow, the title agency would not have closed on time. *See United Cal. Bank v. Prudential Ins. Co. of Am.*, 140 Ariz. 238, 283 (App. 1983) ("A repudiating party is not entitled to demand performance from the innocent party or use the latter's failure to tender as a defense to the claimant. . . . [T]he law does not require the nonbreaching party to do a futile or useless act."). Thus, the court did not err by finding Capstone's material breach excused Zaki's performance to timely close escrow because Zaki acted in good faith, and Capstone's material breach occurred first. *See Murphy Farrell Dev., LLLP v. Sourant*, 229 Ariz. 124, 133, ¶ 33 (App. 2012) ("[A]n uncured material breach of contract relieves the non-breaching party from the duty to perform and can discharge that party from the contract."); *Zancanaro v. Cross*, 85 Ariz. 394, 400 (1959) ("Ordinarily the victim of a minor or partial breach must continue his own performance, while collecting damages for whatever loss the minor breach has caused him; the victim of a material or total breach is excused from further performance. . . ." (citation omitted)).

**ATTORNEY'S FEES AND COSTS**

**¶29**        Both Zaki and Capstone request an award of attorney's fees and costs on appeal according to the contract and under A.R.S. § 12-341.01. Because Zaki has prevailed on appeal, we award him reasonable attorney's fees and costs according to the terms of the contract, subject to compliance with Arizona Rule of Civil Appellate Procedure 21.

**CONCLUSION**

**¶30**        We affirm the superior court's judgment.



AMY M. WOOD • Clerk of the Court
FILED:  AA